MICHAEL J. GABLEMAN, J.
f 1. We review an unpublished, per curiam decision of the court of appeals that reversed the Columbia County circuit *170 court's[1] judgment of conviction taken against Stanley J. Maday Jr. ("Maday") and which granted Maday a new trial. State v. Maday, No. 2015AP366-CR, unpublished slip op. (Wis. Ct. App. Oct. 29, 2015).
¶ 2. On January 15, 2013, following a jury trial, Maday was convicted of three counts of first-degree sexual assault of a child. Maday moved for postconviction relief, arguing that he received ineffective assistance of counsel because: (1) his counsel failed to object to two questions the prosecutor asked Catherine Gainey ("Gainey"), the social worker who conducted a cognitive graphic interview with the child victim in this case, and (2) his counsel should not have withdrawn an objection to the introduction of evidence about Maday's job-related training in the use of weapons and the use of force.
¶ 3. We hold that Gainey's testimony about the absence of indications during the cognitive graphic interview, either that K.L. had been coached or that K.L. was being dishonest, does not violate the Haseltine[2] rule, and is therefore admissible. We so hold for three reasons. First, Gainey's testimony was limited to her observations of indications of coaching and dishonesty. Second, by limiting her testimony to indications of coaching and dishonesty, Gainey did not provide a subjective opinion as to K.L.'s truthfulness. Third, testimony, such as Gainey's, may assist the jury. Accordingly, we conclude that Maday's counsel was not ineffective for failing to object to Gainey's testimony and counsel's performance was therefore not deficient.
*171 ¶ 4. Furthermore, we conclude Maday's counsel was not ineffective for withdrawing his objection to the introduction of evidence of Maday's job-related training in the use of weapons and the use of force because Maday was not prejudiced by that testimony.
¶ 5. The decision of the court of appeals is, therefore, reversed.
¶ 6. We begin our analysis with a brief factual background and procedural history. We then turn to a discussion of forensic interview techniques, the Haseltine rule, and the application of the Haseltine rule to Gainey's testimony in this case. After concluding Gainey's testimony does not violate the Haseltine rule, we address Maday's claim of ineffective assistance of counsel.
I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY
¶ 7. In November 2011, the mother of eleven-year-old K.L. found a letter authored by K.L. that described how Maday sexually assaulted K.L. on three occasions. In the letter, K.L. described how, when she slept over at her friend's house, Maday (her friend's father) put his hands in her pants, placed his fingers in her vagina, and slipped his hands under her bra to feel her breasts. After finding this letter, KL.'s mother reported Maday to the police. Due to the fact that K.L. was eleven years old, the police arranged to have K.L.'s allegations assessed by means of a forensic interview with a social worker. The social worker, Gainey, interviewed K.L. about her allegations. Gainey conducted the interview using a type of forensic interview technique called a cognitive graphic interview.
*172 ¶ 8. For his part, Maday denied K.L.'s allegations, and pled not guilty to three counts of first-degree sexual assault of a child in violation of Wis. Stat. § 948.02(1)(b)[3] and § 948.02(1)(e).[4] The case proceeded to trial by jury.
¶ 9. The trial began with the prosecutor calling K.L. to the stand. Crying, K.L. read to the jury the letter she wrote to her mother:
Dear Mom, I'm scared to tell you in person so I wrote this letter. Stan has been sexually harassing me while I'm asleep. I wake up to him either sticking his hand down my shirt and bra or down my pants and underwear. I don't do anything because I'm afraid he will hurt me. He's done this three times now. He did it Friday night. He stuck his hand down my pants and started rubbing there, and then he stuck his finger in my vagina. Then he also stuck his hand down my shirt and my bra, grabbed my boob. I was moving and was moving it around. I know I should have told you the first time this happened, but I was too scared. He's done it three times now, and I want it to stop now if I file papers against him or take him to court. Sincerely, [K.L.]
At trial, K.L. explained the letter she wrote to her mother by further describing the sexual assaults. K.L. testified about one of the assaults: "I remember in the middle of the night that I woke up to Stan touching me and the T.V. being on and [my friend] still being next to me sleeping." She also described how, on *173 another occasion, she awoke on the top bunk in her friend's bedroom to Maday touching her.
¶ 10. K.L. testified that she did not open her eyes during these assaults until she knew Maday had left the room "[b]ecause I figured if he knew I was awake, he would end up hurting me." Only during the second assault did K.L. say she opened her eyes, but only briefly, lest Maday realize he woke her up. K.L. also described how, on at least one occasion, Maday placed his finger in her vagina.
¶ 11. During his cross-examination of K.L., Ma-day's counsel played portions of KL.'s videotaped cognitive graphic interview with Gainey for the purpose of showing the jury the inconsistencies—the precise number of fingers Maday inserted into her vagina and the exact dates of the assaults—between KL.'s trial testimony and what K.L. told Gainey during the cognitive graphic interview. K.L. testified that the inconsistencies were the result of her "remembering new things" from being forced to think about what happened to her.
¶ 12. The State subsequently called KL.'s mother, and she testified that, when she returned home from work one day, she found the letter that K.L. had written on her bed. She testified that after finding the letter she went to KL.'s room where she woke up K.L. to talk about the letter. KL.'s mother testified that "[K.L.] was having a hard time talking" and that "[s]he was crying, shaking, scared," and "hysterical." It was at this point, KL.'s mother said, that she alerted the police.
f 13. As part of the defense's case-in-chief, Mad-ay's counsel called Gainey to testify about the cognitive graphic interview she conducted with KL. Gainey described the type of forensic interview technique, the *174 cognitive graphic interview, that she uses when interviewing children about their sexual assault allegations and how it is "a rather highly structured interview." She testified that she was "specially trained" in using the cognitive graphic interview "to not conduct leading interviews of children"; that she has conducted about fifty of these types of interviews; and that she has "had experiences in the past where children have been essentially prompted by an adult to give a certain type of answer during this interview" but that, by using the cognitive graphic interview, such prompting "become[s] apparent."
¶ 14. Gainey also described how a cognitive graphic interview is designed to minimize the risk of false allegations by, among other things, avoiding leading questions and "mak[ing] sure there is consistency between what they are telling [the interviewer] or have told other people." The point, according to Gainey, is to use the cognitive graphic interview to minimize the risk that a child's allegations are a result of coaching by another and to determine if the child fully understands the difference between truth and lies, along with the consequences of lying.
¶ 15. Gainey testified that, when done correctly, the interviewer in a cognitive graphic interview uses open-ended questions to let the child introduce information into the conversation and express what happened in his or her own words. The interviewer also engages in a "truth-lie" discussion in order to determine if the child adequately understands the difference between the concepts of truth and lies, the importance of telling the truth, and the consequences of lying. At the end of an interview using "the proper interview technique," it "become [s] apparent" if a child has "been essentially prompted by an adult to give a *175 certain type of answer." In short, the cognitive graphic interview technique "is a way to insure that a child who has been coached does not continue with the false allegations."
¶ 16. As it specifically pertains to the truth-lie discussion she had during her interview with K.L., Gainey testified, "We reviewed what's called the children's oath. It's, you know, do you promise to tell the truth, the whole truth, and nothing but the truth, and the child at that point states typically yes. In this case, [K.L.] did . . . ." Gainey also recounted that "[K.L.] said somebody could get into trouble such as going to jail when asked if there are consequences for when people lie. And then she promised to tell the truth after that."
f 17. After Gainey testified about the cognitive graphic interview technique, her experience with it, and specifics of her interview with K.L., the prosecutor asked Gainey the following questions that are now at issue and that give rise to the first part of Maday's claim of ineffective assistance of counsel:
[Prosecutor:] Was there any indication that [K.L.] had been coached in any way during her interview?
[Gainey:] No.
[Prosecutor:] Was there any indication that [K.L.] was not being honest during her interview with you?
[Gainey:] No.
Maday's counsel did not object to these questions, and these questions essentially concluded Gainey's testimony.
¶ 18. Maday also testified. During his testimony, he read portions of his work records from his job as a sergeant at Columbia Correctional Institution. He did so for the purpose of casting doubt on whether he could *176 have been at home at the times K.L. claimed he assaulted her. On cross-examination, the prosecutor had Maday read specific entries about job-related training sessions he attended for weapons training and use-of-force training. Maday's counsel objected to this line of questioning as irrelevant, but withdrew the objection. The circuit court noted that "whether or not [K.L.] was aware of these specific trainings, I think it is probably true that she was generally aware" that correctional officers receive weapons and use-of-force training. Maday testified that he never demonstrated these techniques for, or used them on, K.L.
¶ 19. During closing arguments, the prosecutor asked the jury to believe K.L. As part of his argument, the prosecutor referred to Gainey's testimony and reminded the jury that, during the cognitive graphic interview, Gainey did not see any indications that K.L. had been coached or was being dishonest. The prosecutor also commented on Maday's weapons and use-of-force training saying, "He is trained in all those things so [K.L.]'s worry he might do something to her was very real to her. It was very real to her." In an effort to cast doubt on KL.'s testimony, Maday's counsel replayed portions of KL.'s cognitive graphic interview with Gainey to highlight the inconsistencies between K.L.'s interview and KL.'s trial testimony. In particular, he highlighted two inconsistencies: (1) the precise number of fingers Maday placed inside KL.'s vagina and (2) the exact dates of the sexual assaults.
¶ 20. After closing arguments, the circuit court instructed the members of the jury, for the second time during Maday's trial, on their role as the sole judges of the credibility of the witnesses. Specifically, the circuit court instructed the jury that "[y]ou are the sole judges of the credibility, that is believability of the witnesses and of the weight to be given to their testimony."
*177 ¶ 21. The jury chose to believe K.L. It found Maday guilty of all three counts, and the circuit court sentenced Maday to 25 years of initial confinement and 8 years of extended supervision on the first count, 15 years of initial confinement and 8 years of extended supervision on the second count, and 15 years of initial confinement and 8 years of extended supervision on the third count.
¶ 22. On October 23, 2014, Maday filed a motion for postconviction relief. In his motion, Maday argued he received ineffective assistance of counsel, which required the circuit court to grant him a new trial. Maday claimed his counsel was ineffective (1) for failing to object to Gainey's testimony that she observed no indications of coaching or dishonesty during K.L.'s cognitive graphic interview and (2) for withdrawing the objection to the introduction of evidence of Maday's job-related weapons and use-of-force training. The circuit court denied Maday's motion. In denying Maday's motion, the circuit court noted that Gainey's testimony "is about as close as I can personally envision to the line of what is permissible versus impermissible." But, it found Gainey's testimony about the absence of any indications of coaching and dishonesty during the cognitive graphic interview admissible because it "dealt specifically with the videotaped interview." Therefore, there was no deficient performance. The circuit court also noted that the evidence of Maday's job-related training in weapons and use of force was irrelevant but that the evidence was not prejudicial because it is likely commonly assumed that correctional officers have this type of training. Thus, the circuit court found no ineffective assistance of counsel. Maday appealed.
*178 f 23. The court of appeals reversed the circuit court. Maday, unpublished slip op., ¶ 21. It determined that Gainey's testimony violated the Haseltine rule in that her testimony vouched for K.L.'s credibility, and that Maday's counsel was ineffective for failing to object. Id., ¶¶ 19-20.
¶ 24. The court of appeals did not address whether Maday's counsel was ineffective for withdrawing his objection to the evidence of Maday's job-related weapons and use-of-force training because Maday's first argument for ineffective assistance of counsel resolved the case. Id., ¶ 20 n.3.
II. STANDARD OF REVIEW
¶ 25. Whether a defendant received ineffective assistance of counsel is a mixed question of law and fact. State v. Erickson, 227 Wis. 2d 758, 768, 596 N.W.2d 749 (1999). "We will not disturb the circuit court's findings of fact unless they are clearly erroneous." Id. "[T]he circumstances of the case and the counsel's conduct and strategy" are considered findings of fact. State v. Jenkins, 2014 WI 59, ¶ 38, 355 Wis. 2d 180, 848 N.W.2d 786. Whether counsel's performance was ineffective is a question of law that we review independently. Erickson, 227 Wis. 2d at 768.
III. DISCUSSION
¶ 26. In order to assess Maday's claim of ineffective assistance of counsel, we first address whether Gainey's testimony about her observations of indications of coaching and dishonesty made during K.L.'s cognitive graphic interview violates the Haseltine rule. To answer this question, we begin with an explanation *179 of forensic interview techniques and the Haseltine rule. We then address the admissibility of Gainey's testimony. Second, we address Maday's claim for ineffective assistance of counsel.
A. Forensic Interview Techniques
¶ 27. Starting with a series of high-profile child sexual assault cases in the 1980s, the interview techniques used with the children during the investigation of some of these cases raised concerns that children were making false allegations of abuse. See, e.g., McMartin v. Children's Inst. Int'l, 261 Cal. Rptr. 437 (Ct. App. 1989); State v. Michaels, 642 A.2d 1372 (N.J. 1994); see also Sena Garven et al., More than Suggestion: The Effect of Interviewing Techniques from the McMartin Preschool Case, 83 J. Applied Psychol. 347 (1998). Indeed, a large number of what turned out to be false allegations caused the public to perceive children as less-than-credible witnesses because of their vulnerability to suggestion and coaching. See Michaels, 642 A.2d at 1376 ("[0]ur common experience tells us that children generate special concerns because of their vulnerability, immaturity, and impressionability.. . ."). Research on detecting false allegations from children following in the wake of these cases led to a marked improvement in the quality of forensic interview techniques used in child sexual assault investigations, allowing forensic interviewers to better meet the unique situations present in these instances. See Garven et al., supra.
¶ 28. The forensic interview techniques used today are accepted among experts and courts as effective tools for investigating child sexual assault allegations because these methods minimize the risk of false allegations of abuse that result from a child's vulner *180 ability to suggestion and coaching. See Karen J. Saywitz & Lorinda B. Camparo, Contemporary Child Forensic Interviewing: Evolving Consensus and Innovation over 25 Years, in Children as Victims, Witnesses, and Offenders: Psychological Science and the Law 102, 105-06 (Bette L. Bottoms et al. eds., 2009); see also State v. Michael H., 970 A.2d 113, 120 (Conn. 2009) ("In order to discover child abuse, investigators often rely on forensic interviews . . . ."). Indeed, allegations made by children present such a unique circumstance that forensic interview techniques are useful, even necessary, to combat the problems that arise with allegations of abuse made by children. Cf. Michaels, 642 A.2d at 1377 ("That an investigatory interview of a young child can be coercive or suggestive and thus shape the child's responses is generally accepted. If a child's recollection of events has been molded by an interrogation, that influence undermines the reliability of the child's responses as an accurate recollection of actual events.").
f 29. The forensic interview techniques used today, including the cognitive graphic interview technique Gainey used in this case, are designed to address the reliability problems that arise with allegations of abuse made by children and to avoid the problems caused by the interview techniques used previously. See Saywitz & Camparo, supra, at 103. There are a variety of types of forensic interview techniques used to accomplish these results. For example, the court of appeals dealt with the "Step Wise" method, State v. Krueger, 2008 WI App 162, ¶ 5, 314 Wis. 2d 605, 762 N.W.2d 114, and the Supreme Court of South Carolina dealt with the "Rapport, Anatomy, Touch, Abuse Scenario, and Closure" method, State v. Kromah, 737 S.E.2d 490, 499 (S.C. 2013). Here, though, Gainey used *181 a type of forensic interview called the "cognitive graphic interview." See Saywitz & Camparo, supra, at 109-10 (providing a brief description of the cognitive graphic interview technique).
¶ 30. These different types of forensic interview techniques are marked by some common characteristics. Id. at 105-06. First, forensic interview techniques use open-ended questions and avoid leading questions in an effort to allow the child to tell the story in his or her own words. See State v. Hilton, 764 So. 2d 1027, ¶ 20 (La. Ct. App. 2000), cert. denied, 786 So. 2d 113 (La. 2001). Second, forensic interview techniques employ truth-lie discussions wherein the interviewer evaluates the child's understanding of truth and lies and the child's understanding of the consequences for telling lies. See State v. Douglas, 671 S.E.2d 606, 607 (S.C. 2009).
¶ 31. The interviewer trained in a forensic interview technique looks for indications that a child has been coached to make the allegations of abuse or indications that the child is being dishonest in making the allegations of abuse. See State v. Wembley, 712 N.W.2d 783, 790-91 (Minn. Ct. App. 2006), aff'd, 728 N.W.2d 243 (Minn. 2007). For example, a trained forensic interviewer looks at what information the child introduces into the conversation in response to questioning and looks for a child to communicate this information using a vocabulary and understanding consistent with the child's age. See August Piper, Investigating Child Sex Abuse Allegations: A Guide to Help Legal Professionals Distinguish Valid from Invalid Claims, 36 J. Psychiatry & L. 271, 302—03 (2008). The less information a child can produce on his or her own, the more likely a forensic interviewer will take this as an indication that the allegations of abuse *182 are false. The same holds true for how the child communicates that information. Id. at 308. In other words, a forensic interviewer evaluates whether a child's recollection of abuse is "told from a child's viewpoint, and [whether] sexual knowledge in the child's statements or behavior ... is beyond that expected for the child's developmental stage." Id. The more "adult" the child's language, the more likely a forensic interviewer will consider the language to be an indication that the allegations of abuse are false.
¶ 32. As another example, an expert trained in forensic interviewing remains alert for consistency with "explicit details." Id. at 307. "[A] vague or inconsistent account, delivered evasively or using the same rote phrases, detracts from the child's credibility." Id. "[A] child's refusal to discuss details of the abuse should alert the interviewer to the possibility of a fabricated allegation." Id.
¶ 33. These indications are often observable only within the context of a forensic interview and only to a trained interviewer and thus, taken as a whole, fall outside the realm of common knowledge. E.g., Williams v. State, 970 So. 2d 727, ¶¶ 24-27 (Miss. Ct. App. 2007) (admitting a forensic interviewer as an expert because her training in forensic interviewing gave her specialized knowledge). Accordingly, a jury could benefit from an expert's assistance when interpreting and identifying the indications bearing on the independence of a child's allegations of abuse when such situations arise. See Wis. Stat. § 907.02 (2013-14).
B. The Haseltine Rule
f 34. "Under Wisconsin law, a witness may not testify 'that another mentally and physically compe *183 tent witness is telling the truth.'" State v. Jensen, 147 Wis. 2d 240, 249, 432 N.W.2d 913 (1988) (quoting State v. Haseltine, 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984)). Often called the "Haseltine rule," this principle is rooted in the rules of evidence that say "expert testimony must 'assist the trier of fact to understand the evidence or to determine a fact in issue.' " State v. Pittman, 174 Wis. 2d 255, 267, 496 N.W.2d 74 (1993) (quoting Wis. Stat. § 907.02). "Expert testimony does not assist the fact-finder if it conveys to the jury the expert's own beliefs as to the veracity of another witness." Id. The jury is the sole judge of credibility of the witnesses, and a witness who comments on the veracity of another witness usurps this role instead of assisting the jury in fulfilling it. State v. Romero, 147 Wis. 2d 264, 278, 432 N.W.2d 899 (1988).
¶ 35. Accordingly, in State v. Krueger, the court of appeals recognized that expert testimony from a social worker about her observations made during a forensic interview "on typical signs of whether a child has been coached or evidences suggestibility and whether the complainant child exhibits such signs" was admissible. Krueger, 314 Wis. 2d 605, ¶ 14. This was so because it would assist the jury to assess the credibility of the child's allegations of sexual assault. Id., ¶¶ 14-15. The social worker's testimony in Krueger was ultimately found inadmissible, though, because it went a step too far in that the social worker testified that she did not believe the child could maintain her story "unless it was something that she had experienced." Id., ¶ 15. This had the effect of the social worker providing her opinion as to the truth of the child's allegations. Id., ¶ 16. Thus, the social worker's testimony went beyond that of observations of indications of coaching and deceit she made during her forensic *184 interview with the child and, rather, provided a subjective opinion that had the effect of stating that the child was truthful. Id,., ¶ 14. Her testimony violated the Haseltine rule because it usurped the jury's role as sole judge of credibility of the witness as opposed to merely assisting the jury in that role. It is fairly said, then, that while observations of indications of coaching and deceit the interviewers make during the course of forensic interviews may be received into evidence, statements of subjective opinion about the child's truthfulness are not to be received.
f 36. Other jurisdictions, with a rule similar to our Haseltine rule, have allowed an expert such as Gainey to testify about observations made during the course of a forensic interview. E.g., Wembley, 712 N.W.2d at 790-92; Williams, 970 So. 2d 727, ¶¶ 15-17; State v. Champagne, 305 P.3d 61, ¶¶ 33-36 (Mont. 2013). For example, in State v. Kromah, the Supreme Court of South Carolina determined that those who are so trained may testify as to "any personal observations regarding the child's behavior or demeanor" during the forensic interview. Kromah, 737 S.E.2d at 500. An opinion from a forensic interviewer, though, may not include the expression of the expert's belief that the child was being truthful. Id.
C. The Admissibility of Gainey's Testimony Regarding Indications of Coaching and Dishonesty
¶ 37. We turn now to the application of the foregoing principles to the particular testimony at issue in this case in order to determine whether Gainey's testimony about "indications" of coaching and "indications" of dishonesty during the cognitive graphic interview violated the Haseltine rule.
*185 1. Gainey's Testimony Was Limited to Indications of Coaching and Dishonesty and Did Not Provide a Subjective Opinion Regarding KL.'s Truthfulness
¶ 38. As the circuit court found, and as the record bears out, Gainey's testimony was limited only to observations of the indications of coaching and dishonesty she made during the cognitive graphic interview she conducted with K.L. The prosecutor first asked, "Was there any indication that [K.L.] had been coached in any way during her interview?" (Emphasis added). The prosecutor then asked, "Was there any indication that [K.L.] was not being honest during her interview with you?" (Emphasis added). Importantly, both questions are limited to indications. Neither question asked Gainey about her opinion or belief. By limiting it to her observations of indications during the cognitive graphic interview, Gainey's testimony in response to these questions did not provide an opinion about the truth of KL.'s allegations. Rather, Gainey provided an opinion about indications she is trained to observe during a cognitive graphic interview, an interview technique developed specially for dealing with allegations of abuse made by children. As such, Gainey was not "allowed to convey to the jury . . . her own beliefs as to the veracity of the complainant with respect to the assault," Jensen, 147 Wis. 2d at 256-57.
¶ 39. Unlike the social worker in Krueger, Gainey did not take that extra step that turned her testimony into a subjective opinion about KL.'s veracity, and thus into a violation of the Haseltine rule. The State posed the following question in Krueger, "Based upon that, did you form an opinion as to whether or not [S.B.] was the product of any suggestibility or any coaching?" Krueger, 314 Wis. 2d 605, ¶ 5 (alteration in original). The social worker answered:
*186 I did not get a sense from this child that she demonstrated a level of sophistication that [she] would be able to maintain some sort of fabricated story, for lack of a better way of describing it. She did not appear to me to be highly sophisticated so that she could maintain that kind of consistency throughout unless it was something that she had experienced.
Id. (emphasis added). The exchange between the prosecutor and Gainey in this case is considerably different. The prosecutor did not ask Gainey for an opinion of whether K.L.'s testimony "was the product" of suggestibility or coaching but, rather, asked Gainey about observable indications of coaching or dishonesty. Further, Gainey did not testify that K.L. could only maintain the consistency of her allegations "unless it was something that [K.L.] had experienced." Rather, Gainey provided testimony grounded in her training as a forensic interviewer by limiting her testimony to the indications she is trained to look for and, by testifying to a lack of any indications of coaching or dishonesty, Gainey avoided giving an opinion as to whether KL.'s allegations were, in fact, true.
2. Gainey's Testimony May Assist the Jury
¶ 40. Gainey's testimony may have assisted the jury in assessing the credibility of KL.'s allegations and did not usurp the jury's role as the sole judge of credibility of the witness. The indications a forensic interviewer, like Gainey, is trained to look for often fall outside the realm of common knowledge. See, e.g., Jensen, 147 Wis. 2d at 250-52 (allowing expert testimony about the typical behavior of child sexual assault victims); Krueger, 314 Wis. 2d 605, ¶ 9 (examining expert testimony regarding signs of coaching). Forensic interviewers are required to complete training in *187 using such interview techniques, and given the unique circumstances present with assessing allegations of abuse made by children, it is, at a minimum, possible that the jury could benefit from the testimony of a forensic interviewer to help them more accurately assess the credibility of a child's allegations. See Jensen, 147 Wis. 2d at 256 ("While an expert's description of the behavior of victims of crime may assist the jury to understand the evidence in the case or to determine a fact in issue, an expert may be no more qualified to compare behavior patterns than the jury. The jury may be able to draw the requisite inferences itself without the assistance of an expert."). Accordingly, it is at least possible that Gainey, as a trained forensic interviewer, was able to assist, as opposed to usurp, the jury in its role as the sole judge of credibility of the witnesses. As the reasoning of Jensen makes clear, and as we recognize, juries are free either to make use of such testimony or disregard it and rely solely on their own collective wisdom and experience, in accord with the instructions provided to them by the circuit court. See id.
¶ 41. Based on the foregoing, we conclude Gainey's testimony is admissible.
D. Maday's Arguments Against Admission
1. The Question About Indications of Coaching
¶ 42. Maday first argues that, even if testimony about indications of coaching is sometimes admissible, it is admissible only if it includes sufficient detail about what indications the interviewer is looking for because only then is the jury able to draw its own conclusions *188 about the child's allegations. See id. at 255-56. Because these details were not provided here, Maday argues Gainey's testimony violates the Haseltine rule. Maday argues in his brief, "Untethered to background information about the typical signs of coaching, an expert's statement that a child displays no such signs does little to assist the jury and runs an unacceptable 'risk that the jury could interpret the testimony as an opinion that the complainant is being truthful about the assault,' " Jensen, 147 Wis. 2d at 256.
¶ 43. Gainey provided background information as context for her testimony in regard to the indications of coaching and dishonesty during the cognitive graphic interview. On direct examination, defense counsel introduced the concept of a cognitive graphic interview by asking Gainey, "And that's a rather highly structured interview, isn't it?" Gainey responded, "Yes." Defense counsel asked next, "Why do you go through that kind of structure . . . when interviewing a child?" Gainey answered, "I'm specialized, specially trained in that technique to not conduct leading interviews of children. We also videotape and do that format of an interview so the video can be introduced rather than having the child testify at every hearing."
¶ 44. On cross-examination, the prosecutor expanded on defense counsel's questioning and asked Gainey about the cognitive graphic interview technique that she uses to conduct forensic interviews:
Q. Can you explain more fully the benefits of conducting the cognitive graphic type interviews with children?
A. The benefit most importantly is to have that interview done on video so in a matter where the *189 case is taken to the criminal level, the video can be submitted versus having the child appear and testify at multiple hearings.
Q. But the interviewing technique you have been trained on?
A. Oh, I'm sorry. The technique is to make sure the child fully understands the difference between truth and lies so they understand if they are making up allegations, there are consequences for those lies. Also to make sure that there is consistency between what they are telling me or have told other people. I'm not sure if there is anything else I'm missing from your question.
Q. No. I think that's fully answered my question. We did not watch the whole video. We just watched the sort of midsection when you were actually discussing the allegations that she had made. So at the beginning part of the video that we didn't see, you cover the difference between truth and lie?
A. Yes.
Q. And was [K.L.] actually placed under oath?
A. She was. We reviewed what's called the children's oath. It's, you know, do you promise to tell the truth, the whole truth, and nothing but the truth, and the child at that point states typically yes. In this case she did, and then we have them sign their name to the document as well.
Q. Did in this instance you also cover consequences for not telling the truth?
A. Correct. And I believe with this interview she said somebody could get into trouble such as going to jail when asked if there [are] consequences for when people lie. And then she promised to tell the truth after that.
*190 Q. How long have you been conducting these kinds of interviews?
A. I would say [I] probably was trained at least, well, probably going on three years.
¶ 45. Gainey also described how she avoids leading questions because she wants the child to introduce information into the conversation:
Well, for example, where did your dad touch you. Okay, so you are indicating that, as the interviewer, I know that this man even though you haven't identified him [as] the person that touched you, they did touch you. If the child has not offered that information, you don't introduce that information.
Gainey also described how she uses cognitive graphic interview techniques to "kind of open the door for children to talk about if something has happened to them" by using body diagrams:
We show them a body diagram. We go over the different body parts, have them use the words that they prefer to describe the different body parts. Then we ask them has anybody or do you know what parts on your body are okay or not okay for other people to touch. Then have them identify those body parts, and then we simply ask has anybody touched you anywhere on your body. They can indicate yes or no or where those things happened.
¶ 46. After describing how she avoids leading questions and uses body diagrams, Gainey further testified:
Q. And you conduct the interview that way because it makes the answers more reliable?
A. Yes.
*191 Q. Have you had experiences in the past where children have been essentially prompted by an adult to give a certain type of answer during this interview?
A. Yes.
Q. And does that become apparent when you use the proper interview techniques?
A. Yes.
Q. So using these interview techniques is a way to insure that a child who has been coached does not continue with the false allegations during the interview?
A. Yes.
¶ 47. In light of the testimony described above, we conclude Gainey did provide a sufficient contextual basis to testify about the indications she observed or, more to the point, did not observe during the course of her cognitive graphic interview with K.L. Jensen requires Gainey to provide sufficient detail about what she is trained to look for, see Jensen, 147 Wis. 2d at 255, and Gainey did so. Gainey discussed the truth-lie discussion she engaged in. She described the open-ended questions she used, and she described how she tried to have K.L. describe the assaults in K.L.'s own words.
2. The Question About Indications of Dishonesty
¶ 48. Second, Maday argues that even if Gainey is allowed to testify about indications of coaching, Gainey should never have been allowed to testify about indications that K.L. "was not being honest."
*192 ¶ 49. Viewed in isolation, a question about indications of whether a witness was "being honest" would seem to go more directly to truthfulness than a question about indications of coaching. Here, though, we are not viewing Gainey's testimony in isolation, but rather, we view it in the context of a cognitive graphic interview. Gainey was not asked to, and in fact did not, opine about the veracity of another witness's testimony. Rather, Gainey was asked about her observations of indications of dishonesty during a cognitive graphic interview. We honor the principle that a jury normally needs no help assessing whether a witness is telling the truth. However, we must also recognize the development of specialized, technical interview methods for investigating allegations of child sexual abuse as well as the case law that gives them life in the courtroom. See, e.g., Tenn. Code Ann. § 24-7-123 (Supp. 2016) (allowing the use of a videotaped forensic interview as evidence if certain conditions are met); Michael H., 970 A.2d at 116 (using a forensic interview to investigate allegations of child sexual abuse); Hilton, 764 So. 2d 1027, ¶ 20 (using a forensic interview at the Jefferson Parish Children's Advocacy Center as part of an investigation into allegations of child sexual abuse); Wembley, 712 N.W.2d at 790-92 (allowing testimony of a forensic interview conducted at CornerHouse in a child sexual abuse case); Champagne, 305 P.3d 61, ¶ 36 ("The District Court properly allowed Matkin to testify about a matter to which she had training and experience: whether a victim had been coached."); Kromah, 737 S.E.2d 490 (outlining the parameters for admitting testimony of a forensic interview called the "Rapport, Anatomy, Touch, Abuse Scenario, and Closure" method); Douglas, 671 S.E.2d 606 (evaluating testimony from a forensic interviewer in a *193 case involving child sexual abuse); Krueger, 314 Wis. 2d 605 (using a forensic interview called the "Step Wise" method to investigate allegations of child sexual abuse); see also Victor I. Vieth, The Forensic Interviewer at Trial: Guidelines for the Admission and Scope of Expert Witness Testimony Concerning an Investigative Interview in a Case of Child Abuse, 36 Wm. Mitchell L. Rev. 186 (2009).
¶ 50. Any concerns we may have that Gainey was commenting on K.L.'s veracity were addressed during Gainey's testimony in that Gainey was clear that a cognitive graphic interview helps only to increase the reliability of allegations from children. When the prosecutor asked, "And you conduct the interview that way because it makes the answers more reliable," Gainey answered, "Yes." Of at least equal importance, Gainey also answered, "True," in response to defense counsel's question asking, "There is no way for you when conducting an interview to decide to know whether or not previous interviews or questioning has influenced the child's memory." Gainey never implied, much less said, that K.L. was telling the truth. Rather, her testimony was expressly limited both as to scope (the cognitive graphic interview) as well as to the fact that, based upon her training and experience, she did not see any indications of dishonesty, all of which the jury was free to either use for assistance or disregard entirely.
¶ 51. Therefore, Gainey's testimony does not violate the Haseltine rule because her testimony was limited to commenting on observations of indications she made during her cognitive graphic interview with K.L. and her testimony included the foundation of her training and experience.
*194 E. The Circuit Court's Instructions
¶ 52. The circuit court instructed the jury on two occasions that it, the jury, was the sole judge of credibility of the witnesses. We generally assume that the jury follows its instructions. E.g., State v. Anthony, 2015 WI 20, ¶ 89, 361 Wis. 2d 116, 860 N.W.2d 10. With no reason to set this assumption aside, we assume here that the jury fulfilled its role as the sole judge of credibility and determined the credibility of KL.'s testimony for itself. While Gainey's testimony is admissible, the circuit court's proper instruction of the jury helps us in reaching our conclusion because it provides additional assurance that Gainey did not usurp the jury's role as the sole judge of credibility of the witnesses.
F. Maday's Claim of Ineffective Assistance of Counsel
¶ 53. Maday claims his counsel was ineffective for failing to object to Gainey's testimony and for withdrawing an objection to the introduction of evidence of Maday's job-related training in weapons and use of force. We address each claim in turn, and ultimately, we conclude that neither claim results in ineffective assistance of counsel.
1. The Strickland Test
1 54. Under the Sixth Amendment of the United States Constitution and Article I, Section 7 of the Wisconsin Constitution, a criminal defendant has the constitutional right "to the effective assistance of counsel," Strickland v. Washington, 466 U.S. 668, 686 *195 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). Thus, a criminal defendant is denied his constitutional rights when he or she receives ineffective assistance of counsel. The test to determine ineffective assistance of counsel is a two-prong test commonly known as the "Strickland test." Erickson, 227 Wis. 2d at 768. Under the first prong, the defendant must show that counsel's performance was deficient. Id. Here, the question for the court is whether counsel's performance fell below an objective standard of reasonableness. State v. Thiel, 2003 WI 111, ¶ 19, 264 Wis. 2d 571, 665 N.W.2d 305. Under the second prong, the defendant must show that he was prejudiced by counsel's deficient performance. Erickson, 227 Wis. 2d at 768. Here, the question for the court is whether the deficient performance undermines confidence in the outcome. Id. (quoting Strickland, 466 U.S. at 694). Both prongs must be satisfied in order to find ineffective assistance of counsel. Id.
2. Counsel's Failure to Object to Gainey's Testimony Is Not Ineffective Assistance of Counsel
¶ 55. It follows that Maday's counsel was not deficient for failing to object to Gainey's testimony because we hold that her testimony is admissible. State v. Johnson, 2004 WI 94, ¶ 24, 273 Wis. 2d 626, 681 N.W.2d 901. Counsel's performance cannot be considered deficient for failing to object to admissible evidence. See State v. Maloney, 2005 WI 74, ¶¶ 25-30, 281 Wis. 2d 595, 698 N.W.2d 583. Even though the admissibility of Gainey's testimony at the time of the trial may have been unclear, this does not mean counsel was required to object to Gainey's testimony. Id. (discussing that counsel has no duty to object to *196 every possible violation, particularly when the state of the law is unsettled or unclear). In fact, it is axiomatic that "[c]ounsel is not required to object and argue a point of law that is unsettled." Id., ¶ 28 (quoting State v. McMahon, 186 Wis. 2d 68, 84, 519 N.W.2d 621 (Ct. App. 1994)).
¶ 56. In sum, Maday did not receive ineffective assistance of counsel because counsel's performance was not deficient. There is no need to analyze prejudice because his claim for ineffective assistance of counsel cannot satisfy both prongs. Id., f 14 ("We need not address both components of the inquiry if the defendant makes an insufficient showing on one.").
3. Counsel's Withdrawn Objection to the Training Evidence Is Not Ineffective Assistance of Counsel
¶ 57. In addition to claiming ineffective assistance of counsel based on his counsel's failure to object to Gainey's testimony, Maday claims his counsel was ineffective for withdrawing an objection to the introduction of evidence of his job-related training in weapons and use of force. Because neither party disputes that this evidence is irrelevant, we will assume without deciding that counsel's performance was deficient when he withdrew his objection to introduction of the evidence. See State v. Smith, 207 Wis. 2d 258, 274-75, 558 N.W.2d 379 (1997). Thus, the first prong is assumed to be satisfied, and we move to the second prong to look for prejudice.
¶ 58. When determining if counsel's deficiency undermines confidence in the outcome of the trial and amounts to prejudice, "a court hearing an ineffective *197 ness claim must consider the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695.
¶ 59. The totality of the evidence before the jury in this case shows no reason why our confidence in the outcome should be undermined. Before the training evidence even entered the courtroom, K.L. testified that she did not report the sexual assaults earlier because she was afraid of Maday and because she knew he had weapons. Further, the jury's perception of Maday likely did not change by hearing testimony of his training because, as the circuit court noted, it is likely commonly assumed that someone of Maday's position, i.e., a correctional officer, has training in weapons and use of force. Thus, there is no prejudice here, and Maday cannot meet the second prong. We are not persuaded that admitting evidence of Maday's training in weapons and use of force undermines confidence in the outcome given the totality of the evidence before the jury.
¶ 60. In short, Maday cannot show he received ineffective assistance of counsel. As to his first claim, we conclude there is no deficient performance, and as to his second claim, we conclude there is no prejudice.
IV. CONCLUSION
f 61. We hold that Gainey's testimony about the absence of indications during the cognitive graphic interview either that K.L. had been coached or that K.L. was being dishonest does not violate the Haseltine rule, and is therefore admissible. We so hold for three reasons. First, Gainey's testimony was limited to her observations of indications of coaching and dishonesty. Second, by limiting her testimony to indications of coaching and dishonesty, Gainey did not provide a *198 subjective opinion as to K.L.'s truthfulness. Third, Gainey's testimony may assist the jury. Accordingly, we conclude that Maday's counsel was not ineffective for failing to object to Gainey's testimony. Counsel's performance was not deficient because Gainey's testimony is admissible.
¶ 62. Furthermore, we conclude Maday's counsel was not ineffective for withdrawing his objection to the introduction of evidence of Maday's job-related training in the use of weapons and the use of force because Maday was not prejudiced by that testimony.
By the Court.—The decision of the court of appeals is reversed.

 The Honorable W. Andrew Voigt presiding.

 State v. Haseltine, 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984) (prohibiting a witness from "giv[ing] an opinion that another mentally and physically competent witness is telling the truth").

 "Whoever has sexual intercourse with a person who has not attained the age of 12 years is guilty of a Class B felony." Wis. Stat. § 948.02(1)(b) (2009-10).

 "Whoever has sexual contact with a person who has not attained the age of 13 years is guilty of a Class B felony." Wis. Stat. § 948.02(1)(e) (2009-10).