**2025 WI 21**

# Supreme Court of Wisconsin



STATE OF WISCONSIN,
*Plaintiff-Respondent-Petitioner,*

*v.*

JOBERT L. MOLDE,
*Defendant-Appellant.*

No. 2021AP1346-CR
Decided June 13, 2025

REVIEW of a decision of the Court of Appeals
Dunn County Circuit Court (Rod W. Smeltzer, J.) No. 2017CF34

HAGEDORN, J., delivered the majority opinion for a unanimous Court. KAROFSKY, J., filed a concurring opinion.

¶1 BRIAN HAGEDORN, J. Under the *Haseltine* rule, witnesses may not testify that they think another witness is telling the truth. Vouching for the credibility of another witness is impermissible under the rules of evidence because it invades the province of the trier of fact—here, the jury. The question in this case is whether an expert witness violated the *Haseltine* rule when she testified that only around one percent of child sexual assault disclosures are false, but did not offer an opinion on whether the victim in this case was telling the truth. We conclude she did not. We hold that statistical evidence alone on the likelihood of false reports does not violate the *Haseltine* rule. The defendant here alleges his counsel was constitutionally deficient for not raising a *Haseltine* objection

to this testimony. Because such an objection would have failed, the defendant's claim for ineffective assistance of counsel fails as well.

## I.  BACKGROUND

¶2      The issues in this case arose following allegations that, sometime between January 2011 and January 2012, Lauren[1] was sexually assaulted by her father, Jobert Molde. This came to light in 2017 when Lauren—now age thirteen—attempted suicide. After Lauren's claims were investigated, Molde was charged with one count of first-degree sexual assault of a child who had not attained the age of twelve and one count of incest with a child. The crucial evidence against Molde was Lauren's in-court testimony recounting the assault and a recording of her forensic interview.

¶3      The circuit court granted the State's motion to have the nurse practitioner who conducted the forensic interview testify as an expert at trial. However, she was unavailable, and the circuit court permitted Dr. Alice Swenson—a licensed child abuse pediatrician who supervised Lauren's forensic interview and examination—to testify instead. The record is unclear about what her supervision entailed other than it was in real time; but Dr. Swenson did not personally conduct an evaluation of Lauren. Dr. Swenson testified about her background and work as a licensed child abuse pediatrician, how child forensic interviews tend to proceed, what sort of evidence they look for in a physical forensic exam, background about how children's memories work, Lauren's admission to the hospital, and the possibility of intercourse between an adult and child. She did not testify about Lauren's truthfulness or how likely it is that Lauren was telling the truth during the interview.

¶4      After Dr. Swenson's testimony, one juror submitted two questions, which the circuit court previously instructed was permissible. Following a sidebar, Molde's counsel did not object to the questions being read to the witness:

> THE COURT: Doctor, it says how frequent is it for children to make up a story of sexual abuse?

---

[1] "Lauren" is a pseudonym. *See* WIS. STAT. § (Rule) 809.86(1), (4).

THE WITNESS: False disclosures are extraordinarily rare, like in the one percent of all disclosures are false disclosures.

THE COURT: Second part of that is why would they do that?

THE WITNESS: I don't think I really have an answer to that.

Molde's attorney did not object or otherwise challenge Dr. Swenson's answers. The court then permitted Molde's counsel to ask a follow-up question:

[MOLDE'S COUNSEL]: Are there particular studies that have been conducted regarding the reporting of false accusations?

THE WITNESS: There are that I've read, yes. I don't know the names of them off the top of my head.

¶5    The trial proceeded and the jury found Molde guilty on both counts. Following his conviction, Molde moved for postconviction relief. He contended that his trial counsel should have objected to Dr. Swenson's testimony as impermissible vouching, and this failure constituted ineffective assistance of counsel. The circuit court denied the motion, in part because Dr. Swenson did not comment "on the credibility of the victim in this case as to whether she was telling the truth or not."

¶6    Relying on its prior published decisions, the court of appeals held that Dr. Swenson's testimony constituted impermissible vouching, and that Molde's attorney was constitutionally ineffective for failing to object. *State v. Molde*, No. 2021AP1346, unpublished slip op., ¶3–4 (Wis. Ct. App. May 21, 2024). The state petitioned for review, which we granted.

## II. DISCUSSION

### A. THE LAW

¶7    In Wisconsin, the trier of fact—often a jury—is entrusted with the duty to make factual determinations at trial. *See State v. Maday*, 2017 WI 28, ¶34, 374 Wis. 2d 164, 892 N.W.2d 611 (explaining that conveying information to the jury is conveying it to the fact-finder). As part of that role, the jury must decide for itself whether to believe a

witness's testimony in whole, in part, or not at all. *See Roberts v. State*, 84 Wis. 361, 368, 54 N.W. 580 (1893) (explaining that the jury has the exclusive role to pass on the credibility of the witness).

¶8      In *State v. Haseltine*, the court of appeals considered the testimony of a psychiatrist in a case likewise involving a father's sexual assault of his daughter. 120 Wis. 2d 92, 95–96, 352 N.W.2d 673 (Ct. App. 1984). The psychiatrist, who was qualified as an expert, testified regarding typical patterns of behavior for victims of incest. *Id*. But the court also permitted the psychiatrist to offer his professional opinion that the victim fit the typical case, and that he had "no doubt whatsoever" that the father sexually assaulted his daughter. *Id*. at 96. The court of appeals held that this was error, and laid out some basic principles that continue through our cases today.

¶9      First, the expert's opinion that the victim was telling the truth went too far. The foundation for this is WIS. STAT. § 907.02 (2023–24),[2] which then, as now, states in relevant part that an expert witness's testimony must "assist the trier of fact."[3] Because the jury is the ultimate arbiter of credibility, "[n]o witness, expert or otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth." *Haseltine*, 120 Wis. 2d at 96. This principle—that vouching for the credibility of another witness is impermissible—has since become known as the *Haseltine* rule.

¶10      Even so, expert testimony that helps the jury assess credibility or understand the victim's testimony is permitted. *Id.* at 96–97. The court explained that expert evidence regarding why incest victims might delay in reporting or recant accusations could aid the jury, which might otherwise "regard such behavior as an indication that the victim was not telling the truth." *Id.* at 97.

---

[2] All subsequent references to the Wisconsin Statutes are to the 2023–24 version unless otherwise indicated.

[3] The Wisconsin Rules of Evidence were originally adopted by this court in 1973. 59 Wis. 2d Ri, *et seq*. (1973). The legislature modified the standards for admission of expert testimony in 2011. 2011 Wis. Act 2, § 34m. But the basic principle that expert testimony must "assist the trier of fact" remains the same.

¶11    Thus, the key principle is this: expert testimony may assist the jury in determining the credibility of another witness, but it may not supplant the jury's role by opining on the witness's credibility. To be sure, any expert testimony should be properly admitted under the appropriate rules. WIS. STAT. § 907.02. And of course, it is subject to thorough vetting and cross-examination by opposing counsel. The jury can then weigh the credibility of the expert testimony and consider that along with other evidence to determine the credibility of the victim and other testifying witnesses. This rule preserves the jury's exclusive role as the trier of fact, while permitting the jury to consider all relevant information in making its ultimate determinations.

¶12    This court has adopted the *Haseltine* rule and applied it in multiple cases. We summarize several key cases that reinforce this distinction.

¶13    In *State v. Robinson*, we permitted the expert testimony of a rape crisis center worker who opined on the common emotional reactions of sexual assault victims following an assault. 146 Wis. 2d 315, 431 N.W.2d 165 (1988). We concluded the evidence served "a particularly useful role by disabusing the jury of some widely held misconceptions" about the way sexual assault victims respond emotionally, and noted that the "witness was not asked to draw any inferences or offer any opinions about the complainant in this case." *Id.* at 333, 335.

¶14    In *State v. Jensen*, we permitted the testimony of a school guidance counselor who testified as an expert that a victim's "'acting out' behavior" was "consistent with children who were victims of sexual abuse." 147 Wis. 2d 240, 246, 432 N.W.2d 913 (1988). We held that such testimony permissibly "provided information about behavioral characteristics of child sexual abuse victims that may have been outside the jurors' common experience." *Id.* at 252. And the expert did not "explicitly or implicitly conclude that this complainant was a victim of sexual assault." *Id.* at 255. This left the jury "free to draw its own inferences"—either accepting the expert's testimony or not in determining whether the defendant was guilty. *Id.*

¶15    In *State v. Romero*, decided the same day as *Jensen*, we determined that the lay testimony of a social worker and a police officer was improper. 147 Wis. 2d 264, 297, 432 N.W.2d 899 (1988). There, the two witnesses testified that the complainant in that case was telling the truth, a characterization seized on by the prosecutor in closing argument. *Id.* at

277. We concluded that this "was not helpful to the jury," but instead "tended to usurp" the jury's role in "assessing the credibility of a complaining witness." *Id.* at 278.

¶16 In *State v. Kleser*, we similarly held that a psychologist had crossed the line and vouched for the truthfulness of the complainant's story. 2010 WI 88, ¶¶98, 101, 328 Wis. 2d 42, 786 N.W.2d 144. We explained that improper vouching need not be explicit; implicit vouching can also "invade[] the province of the fact-finder as the sole determiner of credibility." *Id.*, ¶¶102, 104. We concluded that the psychologist's testimony "impermissibly suggested both that she believed Kleser's account and that the events actually unfolded as Kleser had portrayed them." *Id.*, ¶105.

¶17 Finally, in *State v. Maday*, an expert who conducted a forensic interview of the victim testified regarding her observations during the interview. 374 Wis. 2d 164. In particular, the prosecutor asked whether there was "any indication [the victim] had been coached," and whether there was "any indication [the victim] was not being honest during her interview." *Id.*, ¶17, 38. We held that this did not violate the *Haseltine* rule because she offered an opinion only "about indications she is trained to observe during a cognitive graphic interview," and "did not take that extra step" of opining on the complainant's veracity. *Id.*, ¶¶38–39. The testimony, we concluded, could have assisted the jury, and did not usurp its role as the sole judge of a witness's credibility. *Id.*, ¶40.

¶18 From these cases, we see that the main question is whether the testimony assists the jury in assessing the credibility of witnesses, or whether it functionally usurps the jury's fact-finding role. Generally, expert testimony describing typical behavior by those in similar circumstances can serve to assist the jury.[4] Provided it meets the other evidentiary requirements for admissibility, generalized evidence and

---

[4] Expert evidence of general victim behavior can be particularly helpful in cases of child sexual assault, where the victim's behavior can often be "beyond the common sense, experience and education of the average juror." *State v. Lindsey*, 720 P.2d 73, 76 (Ariz. 1986); *see also People v. Julian*, 246 Cal. Rptr. 3d 517, 522 (Cal. Ct. App. 2019) (evidence was "needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.").

personal observations do not, by themselves, run afoul of the *Haseltine* rule. Witnesses cross the line, however, when they take the extra step of implicitly or explicitly opining on whether the complainant is telling the truth. This usurps rather than assists the jury. Whether this has occurred will necessarily be dependent on the facts of a given case.

¶19    The main question presented here is whether expert testimony regarding the likelihood of false reporting, particularly when the evidence demonstrates that false reports are extremely rare, constitutes impermissible vouching. Molde says it does. The court of appeals agreed in a recent case where it held that expert testimony impermissibly vouched for the victim's credibility when two experts testified that 99.2% and 99.33% of victims are truthful. *State v. Mader*, 2023 WI App 35, ¶¶38–39, 408 Wis. 2d 632, 993 N.W.2d 761. It reasoned in part that those percentages amounted to near-mathematical certainty "that false reporting simply does not occur." *Id.*, ¶39. This violated *Haseltine*, the court of appeals ruled, because the jury would inevitably understand this testimony as a statement that the victim was telling the truth. *Id.*

¶20    Applying this holding (as it was bound to do), the court of appeals in this case held that Dr. Swenson's testimony that false reports in these circumstances happen around 1% of the time—meaning 99% of child sexual assault reports are true—violated *Haseltine*. We see it differently.

¶21    Statistical evidence alone is precisely the kind of generalized evidence that might assist the jury, not usurp its role. It does not matter that typical behavior helps one side or another. Statistical evidence by itself does not tell the jury which category—truthful or untruthful—a particular witness belongs to.[5] The jury still must assess the credibility of the statistical evidence and that of the expert, and then weigh that along with the other evidence in the case. The *Haseltine* rule is not violated

---

[5] Courts around the country have both agreed and disagreed with our conclusion. *Compare, e.g., Alvarez-Madrigal v. State*, 71 N.E.3d 887, 892 (Ind. Ct. App. 2017) (finding that an expert testifying "that less than two to three children out of a thousand are making up claims" is not impermissible vouching), *and State v. Harrison*, 340 P.3d 780 (Or. App. 2014) (finding it was not plain error to admit testimony that 96–98% of victim accusations are true), *with Snowden v. Singletary*, 135 F.3d 732, 737, 739 (11th Cir. 1998) (99.5% is impermissible), *and Powell v. State*, 527 A.2d 276, 279 (Del. 1987) (99% is impermissible).

simply because generalized or typical evidence strongly suggests a complainant is telling the truth. A *Haseltine* violation requires the "extra step" of the expert actually opining on the truthfulness of the complainant. *Maday*, 374 Wis. 2d 164, ¶39.

¶22    The contention that only some statistical evidence constitutes impermissible vouching—namely, where the percentage of false reporting approaches mathematical certainty—further demonstrates the weakness of the argument. Suppose evidence in a particular category of cases shows a very high rate of false reporting. Should the defendant be prohibited from presenting this generalized evidence simply because it suggests the complainant may not be telling the truth? Few courts would entertain such an argument. If that is the case, why should relevant and sufficiently reliable evidence be excluded when it shows a very low rate of false reporting? If studies show that false reports occur 50% of the time on the one hand, or 1% of the time on the other, we fail to see why the fact-finder should hear evidence of the former, but not the latter. In both cases, the evidence would tend to assist the jury in assessing the credibility of witnesses. Generalized statistical evidence—whether it is favorable to one side or the other—does not by itself constitute vouching for the truthfulness of a particular witness.

¶23    We stress that our conclusion does not mean all such evidence should be admitted or is impervious to attack. The circuit court still must determine such evidence is admissible—including that the expert is qualified and that her conclusions are "the product of reliable principles and methods" that have been applied "reliably to the facts of the case." WIS. STAT. § 907.02(1). Expert testimony is also subject to other normal evidentiary rules such as the exclusion of evidence that, although otherwise admissible, raises too great a danger of unfair prejudice. *See* WIS. STAT. § 904.03. Molde did not challenge the admissibility of Dr. Swenson's testimony on these grounds, nor does he raise any similar challenge here. In addition, defendants can always challenge the accuracy of statistical evidence and otherwise attack the credibility of expert witnesses through cross-examination, competing experts, and other means. The adversarial process is designed to assist the trier of fact. We are not persuaded that statistical evidence which strongly supports a complainant's story necessarily interferes with the fact-finder's prerogative to determine that witness's credibility.

¶24    In short, statistical evidence alone—even evidence that demonstrates false reports are extremely rare—does not violate *Haseltine*'s

anti-vouching rule. To the extent that *Mader* and other court of appeals cases hold to the contrary, they are overruled.

## B. APPLICATION

¶25   In this case, we conclude that Dr. Swenson's statistical testimony did not cross the line into impermissible vouching. Dr. Swenson testified that "false disclosures are extraordinarily rare, like in the one percent of all disclosures are false disclosures." Dr. Swenson's answer to the jury question did nothing more than tell the jury that false disclosures are, statistically speaking, uncommon. She did not directly or indirectly comment on the veracity of Lauren's allegations against her father. Dr. Swenson never indicated that she thought Lauren was telling the truth. The juror's question was statistical in nature: "[H]ow frequent is it for children to make up a story of sexual abuse?" Dr. Swenson answered the juror's question directly and did not take that extra step of applying it to Lauren's testimony.

¶26   Molde contends that Dr. Swenson's supervision of the forensic interview transformed her testimony into implicit vouching. The jury, Molde argues, would have understood Dr. Swenson's answer as a personal or particularized endorsement of Lauren's credibility. But the record does not reflect what this supervision entailed; we have no way of knowing how closely Dr. Swenson got to know Lauren—if at all. We do not believe that Dr. Swenson's supervisory role automatically transforms her answer to the juror's question about false reporting into an opinion that Lauren herself was telling the truth.

¶27   Molde's core legal claim in this case is that he received ineffective assistance of counsel when his lawyer did not raise a *Haseltine* objection to the juror's questions. Ineffective assistance requires that Molde prove he was prejudiced as a result of his counsel's constitutionally deficient performance. *State v. Nietzhold*, 2023 WI 22, ¶18, 406 Wis. 2d 349, 986 N.W.2d 795. Because Dr. Swenson offered permissible statistical testimony instead of impermissible vouching, we conclude Molde's counsel had no duty to object to this admissible testimony. Accordingly, his counsel was not deficient for failing to raise a *Haseltine* objection, and Molde's ineffective assistance of counsel claim fails.[6]

---

[6] *See Strickland v. Washington*, 466 U.S. 668, 697 (1984) ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the

## III. CONCLUSION

¶28    The question in this case is whether Dr. Swenson violated the *Haseltine* rule when—in response to a question from a juror—she testified that around one percent of child sexual assault disclosures are false. We conclude she did not. We hold that statistical evidence alone about the prevalence of false reporting does not violate the *Haseltine* rule. Dr. Swenson did not, either in answering this question or otherwise, offer an opinion that Lauren was telling the truth. Molde contends that his trial counsel was constitutionally deficient for failing to object to this testimony as a violation of the rule against impermissible vouching. Because this was not a *Haseltine* violation, Molde's counsel was not deficient for failing to raise an improper vouching objection. Therefore, Molde's ineffective assistance of counsel claim does not succeed. The decision of the court of appeals is reversed.

*By the Court.*—The decision of the court of appeals is reversed.

---

inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

JILL J. KAROFSKY, J., concurring.

¶29    I write separately to elevate the voice of Lauren,[1] the victim in this case whose courage and perseverance allowed her to overcome the "herculean task of reporting sexual abuse."[2] Lauren's father, Jobert Molde, sexually assaulted her when she was eight or nine years old. Lauren found her voice five years later, after a suicide attempt, when she reported the crime. Lauren found her voice again during her forensic interview when she relayed details of the assault. And at trial, in front of a jury of strangers, she found her voice yet again to testify about the abuse. Lauren managed to state, in open court, that after her father told her "to be his big girl for daddy," he "had sex" with her by putting his penis in her vagina, which "hurt." The jury believed her.

¶30    The court of appeals did not. The court of appeals overturned Molde's conviction of first-degree sexual assault of a child, relying in large part on its determination that Lauren lacked credibility. The court reached this conclusion because "[t]he sexual assault allegation was not independently corroborated by other evidence; there was no physical evidence; there was only one sexual assault that occurred during a one-year period roughly four to five years prior to Lauren's accusation; and some aspects of Lauren's story changed over time." *State v. Molde*, No. 2021AP1346, unpublished slip op., ¶40 (Wis. Ct. App. May 21, 2024).

¶31    These assertions are as disconcerting as they are misguided. They are predicated upon damaging and victim-blaming misperceptions. Disregarding a child victim's testimony because of delayed reporting, small variations in her narrative, and most alarmingly, the total number of assaults she reported, defies what we know about how child sexual assault victims behave and report.

¶32    *First, delayed disclosure and a lack of corroborating evidence are the norms in child sexual assault cases.* The court of appeals deemed Lauren less credible because she reported the incident four or five years after

---

[1] To protect the privacy and dignity of the victim in this case, I refer to her using a pseudonym. *See also* Wis. Stat. § (Rule) 809.86 (2021–22).

[2] *State v. Hineman*, 2023 WI 1, ¶62, 405 Wis. 2d 233, 983 N.W.2d 652 (Karofsky, J., concurring).

Molde assaulted her, and there was no corroborating evidence. Delayed disclosures are not uncommon. In fact, "70–75% of [child sexual abuse victims] wait[] five years or more before disclosing the abuse."[3] Studies show that only about 30% of those who have experienced child sexual abuse disclosed it during childhood.[4] There are many reasons for these delays, including "an inability to recognize or articulate sexual abuse, an uncertainty about which adults are safe, a lack of opportunities to disclose, fear of not being believed, trauma . . . , and institutional power dynamics." *State v. Hineman*, 2023 WI 1, ¶63, 405 Wis. 2d 233, 983 N.W.2d 652 (Karofsky, J., concurring).

¶33 Because delayed disclosure is the norm, corroborating evidence rarely exists. Indeed, child sexual assault cases are challenging to prosecute due to a "lack [of] concrete physical or medical evidence."[5] The dearth of corroborating evidence has a number of additional causes besides delayed disclosure. Child sexual assault victims often do not evidence physical injuries because children rarely resist their abusers. Moreover, child sexual assaults often lack witnesses because "people simply do not molest children in front of others," and because abusers are more likely to be relatives or acquaintances of the child—people who have more opportunities to be alone with the child.[6] Regardless of the cause, one study showed that "corroborating evidence was only available in 34%

---

[3] Delphine Collin-Vézina et al., *A Preliminary Mapping of Individual, Relational, and Social Factors That Impede Disclosure of Childhood Sexual Abuse*, 43 CHILD ABUSE & NEGLECT 123, 124 (2015).

[4] Eva Jonzon et al., *Disclosure, Reactions, and Social Support: Findings From a Sample of Adult Victims of Child Sexual Abuse*, 9 CHILD MALTREATMENT 190, 194 (2004); *see also* Kamala London et al., *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways that Children Tell?*, 11 PSYCH. PUB. POL'Y & L. 194, 196 (2005).

[5] Marina Moriarty, *Jury Instructions, Not Problematic Expert Testimony, in Child Sexual Assault Cases*, 11 SUFFOLK J. TRIAL & APP. ADVOC. 181, 187–88 (2006).

[6] Judy Yun, *A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases*, 83 COLUM. L. REV. 1745, 1749–50 (1983).

of the cases."[7] Another showed that in "85–95% of cases . . . there is no physical evidence of penetration."[8]

¶34     At Molde's trial, Dr. Swenson testified in detail about these norms. Dr. Swenson detailed common behaviors of child sexual assault victims, including the prevalence of delayed disclosures and the related lack of corroborating evidence. She explained that delayed disclosure is "the rule and not the exception." Dr. Swenson further stated that about 90 percent of child sexual assault victims delay reporting, and in 97 percent of sexual abuse cases, there is no finding of penetration during physical examination. Even so, the court of appeals did not seem to account for that evidence.

¶35     *Second, victims often cannot perfectly recall and recite their trauma.* The court of appeals deemed Lauren less credible for omitting a detail from her forensic interview, changing the timing of a conversation with her younger sister, and being unsure whether Molde was clothed when she first entered his bedroom, even though the rest of her account remained notably consistent. These minor inconsistencies do not necessarily suggest a credibility problem. Rather, they illustrate how most victims report after enduring a traumatic event.

¶36     Child sexual assault victims face numerous challenges to reporting their assaults consistently across multiple recitations. The reason for inconsistency is not dishonesty. Rather, trauma reshapes the wiring of the brain, which can impact memory. For that reason, "[v]ictims can . . . find it difficult to provide a neat chronological account" of their assault."[9] Instead, victims' narratives may be "vague, inconsistent, and

---

[7] Gail S. Goodman et al., *Testifying in Criminal Court: Emotional Effects on Child Sexual Assault Victims*, 57 MONOGRAPHS SOC'Y RSCH. CHILD DEV. 5, 19 (1992).

[8] Madeline L. Porter, *From the Stand to on Tape: Why Recorded Child Victim Testimony Is Safer, More Effective, & Fairer*, 22 U.C. DAVIS J. JUV. L. & POL'Y 37, 42–44 (2018).

[9] DEBORAH TUERKHEIMER, CREDIBLE: WHY WE DOUBT ACCUSERS AND PROTECT ABUSERS 75 (2021).

missing peripheral details; and missing time sequencing of details . . . ."[10] Said differently, Lauren's inability to recite the details of her assault with complete consistency is concordant with someone who has experienced trauma. Small variations in her account are not a reasonable credibility measure. In expecting Lauren to meet an impossibly high memory recall standard, the court of appeals perpetuated the misperception that victims' stories must be precise and consistent, "which presents [an] unfair barrier[] to belief."[11]

¶37　*Finally, the number of assaults reported has absolutely nothing to do with credibility.* The court declared that Lauren lacked credibility because she suffered only one assault.

¶38　It is difficult to even begin to respond to such a baseless statement, especially because, as noted above, most sexual assault victims underreport, or never report, their abuse. It would be completely unreasonable to require robbery victims to suffer two or more robberies before believing them. Why place such a burden on child sexual assault victims? And even if such a credibility threshold exists—to be clear it should not—is there a magic number of sexual assaults that a child must endure in order to be credible? Is it two or three or ten? One can only imagine the compounded chilling effect this elevated credibility standard would have on the already delayed and limited reporting of child sexual assault.

¶39　Lauren defied the odds in reporting her abuse. The court of appeals discredited her for reasons that either fail to account for commonplace behaviors of child sexual assault victims or ignore logic and common sense. Child sexual assault victims must overcome near-insurmountable barriers to reporting abuse and achieving justice. When these brave children speak, courts must ensure they are heard.

---

[10] Jim Hopper, *Important Things To Get Right About the "Neurobiology of Trauma" - Part 1: Benefits of Understanding the Science*, END VIOLENCE AGAINST WOMEN INT'L, Sept. 2020, at 7.

[11] TUERKHEIMER, *supra* note 9, at 75; *see also* Gail S. Goodman & Vicki S. Elgeson, *Child Sexual Assault: Children's Memory and the Law*, 40 U. MIA. L. REV. 181, 190–91 (1985).

¶40    Lauren, you bravely used your voice. I hear you. I believe you.

I respectfully concur.