COURT OF APPEALS
DECISION
DATED AND FILED

May 7, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1261-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. **2017CF132**

**IN COURT OF APPEALS
DISTRICT IV**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

GARY R. SCHUMACHER,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Monroe County: TODD L. ZIEGLER, Judge. *Affirmed*.

¶1    KLOPPENBURG, J.[1]    Gary Schumacher was convicted, upon a jury verdict, of operating a motor vehicle with a prohibited alcohol content (OWI-

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(c) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

PAC) in connection with an accident between Schumacher and another motor vehicle.[2] Schumacher filed a motion for postconviction relief, alleging that his trial counsel was ineffective for failing to adequately cross-examine the State's expert witness who had calculated Schumacher's blood alcohol content (BAC) at the time of the accident, approximately two hours before Schumacher's blood was drawn. The circuit court held a *Machner*[3] hearing and denied the motion, ruling that Schumacher had failed to meet his burden of showing either that trial counsel performed deficiently or that counsel's performance prejudiced Schumacher. Schumacher appeals. I conclude that Schumacher's ineffective assistance claim fails because he has not met his burden to show deficient performance. Therefore, I affirm.

## BACKGROUND

¶2 The following facts are undisputed and, except for procedural facts, taken from the testimony at trial.

¶3 At approximately 8:45 p.m. on February 7, 2017, Schumacher was involved in a two-vehicle accident in Sheldon, Monroe County. Schumacher drove away from the scene of the accident to his residence a short distance away. Approximately forty-five minutes later, Sergeant Ryan Lee of the Monroe County Sheriff's Office arrived at the scene of the accident. Lee talked to the occupants of the second vehicle and then went to Schumacher's residence and talked with Schumacher.

---

[2] Schumacher was also convicted of a hit and run offense and three non-criminal traffic violations, none of which are at issue in this appeal.

[3] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

¶4    Schumacher told Lee that he had consumed one or two beers before the accident and that he had also consumed alcohol after the accident, but he did not say how much or what kind, and Lee saw no evidence of open intoxicants in the residence. Lee ultimately arrested Schumacher for operating a motor vehicle while intoxicated and took him to the hospital, where Schumacher's blood was drawn at 10:56 p.m. Schumacher's BAC at the time his blood was drawn was 0.171 grams per 100 ml of blood, above the legal limit applicable to him of 0.08.

¶5    The State charged Schumacher with operating a motor vehicle with a prohibited alcohol concentration of 0.08 or more, and Schumacher, represented by counsel, proceeded to a jury trial. Among those who testified at trial were the State's expert witness Kristin Drewieck, a chemist with the Wisconsin State Laboratory of Hygiene, and Schumacher. Pertinent details of Drewieck's testimony will be set forth in the discussion below. Summarizing here, Drewieck provided three estimates of Schumacher's BAC at the time of the accident, based on three different sets of assumptions.

¶6    *The first estimate:* Before Schumacher testified, Drewieck testified as to her estimate that Schumacher's BAC at the time of the accident was between 0.190 and 0.210, using a process called "retrograde extrapolation" to extrapolate from the result of the test when the blood was drawn at 10:56 p.m., 0.171, to the time of the accident approximately two hours earlier. She calculated this estimate using an average rate of alcohol elimination and assumptions that the blood was drawn from a man who weighed 200 pounds and that the man had consumed no alcohol between the time of the accident and the time the blood was drawn.

¶7    After Drewieck testified, Schumacher testified that he consumed three Pabst Blue Ribbon beers between 6:00 and 7:30 before the accident, and then

after the accident he consumed three or four, or maybe seven, beers and two shots of whiskey "right before" Lee arrived. Schumacher testified that he threw the beer cans in the sink and pointed to the sink when he told Lee he had consumed more alcohol since the accident.

¶8 *The second estimate:* The State called Drewieck to testify as a rebuttal witness, where, again using retrograde extrapolation, Drewieck estimated that Schumacher's BAC at the time of the accident was between 0.08 and 0.11, based on assumptions that the man from whom the blood was drawn at 10:56 weighed 200 pounds and had consumed three to four beers and two shots of whiskey between 8:45, the time of the accident, and 9:30, when Officer Lee arrived at Schumacher's residence.

¶9 *The third estimate:* Assuming that Schumacher had consumed only the beers and not the shots between 8:45 and 9:30, Drewieck estimated that Schumacher's BAC at the time of the accident was between 0.12 and 0.15.

¶10 The jury found Schumacher guilty of OWI-PAC. Schumacher, by newly appointed counsel, filed a motion for postconviction relief, alleging that trial counsel had provided constitutionally ineffective assistance for failing to cross-examine Drewieck regarding the reliability of retrograde extrapolation and the assumptions she used to perform her calculations; in support of his motion Schumacher cited and provided a 1985 article on the reliability of retrograde extrapolation to calculate BAC. The circuit court held a *Machner* hearing at which trial counsel testified. Pertinent details of trial counsel's testimony will be set forth in the discussion below. As stated, the court denied the motion, ruling that Schumacher had failed to meet his burden of showing either that trial counsel

performed deficiently or that his performance prejudiced Schumacher. Schumacher appeals.

## DISCUSSION

¶11     In well-presented briefing, the parties dispute whether Schumacher has met his burden to show that his trial counsel provided constitutionally ineffective assistance in his cross-examination of Drewieck. I first summarize the applicable standard of review and legal principles, next review additional pertinent background, and then explain why I conclude that Schumacher's ineffective assistance of counsel claim fails.

### I.  Applicable Standard of Review and Applicable Legal Principles

¶12     A defendant claiming ineffective assistance of counsel must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Whether a defendant received ineffective assistance of counsel is a mixed question of law and fact." *State v. Maday*, 2017 WI 28, ¶25, 374 Wis. 2d 164, 892 N.W.2d 611. The circuit court's findings of fact will not be disturbed unless those findings are clearly erroneous. *Id.* "'[T]he circumstances of the case and … counsel's conduct and strategy' are considered findings of fact." *Id.* (quoted source omitted). However, whether those facts constitute deficient performance and whether such deficient performance was prejudicial are questions of law that we review independently. *See State v. Tulley*, 2001 WI App 236, ¶5, 248 Wis. 2d 505, 635 N.W.2d 807. "[T]here is no reason for a court deciding an ineffective assistance claim … to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. I decide this appeal based on the deficient performance prong.

¶13    Counsel's performance is "constitutionally deficient if it falls below an objective standard of reasonableness." *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305.    "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citation omitted).    In other words, professionally competent assistance encompasses a "wide range" of conduct, and a reviewing court starts with the presumption that counsel's assistance fell within that wide range. *Strickland*, 466 U.S. at 689.    "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*    A defendant's burden is to show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

## II.  Additional Pertinent Background

¶14    I now present additional pertinent background comprising the details of Drewieck's testimony and Schumacher's cross-examination at the trial, trial counsel's testimony at the *Machner* hearing, and the circuit court's ruling.

### A.  Drewieck's Testimony and Counsel's Cross-Examination at Trial

#### 1.  Drewieck's Testimony and Counsel's Cross-Examination Before Schumacher Testified

¶15    In her initial testimony, Drewieck testified on direct examination as to her training and experience, and the procedures and verification used in

6

processing Schumacher's blood sample. She testified that the BAC of Schumacher's blood sample was 0.171.

¶16 On cross-examination, Schumacher's trial counsel asked, "You don't know what his BAC was at 8:45 p.m. [the time of the accident], do you?" Drewieck responded, "That's correct. I can make an estimate, but, correct, I do not know."

¶17 On redirect, the State asked Drewieck why the BAC was not 0.171 at 8:45. Drewieck responded,

> There [are] two processes that are involved in this type of scenario. The first is that between 8:45 p.m. and 10:56 p.m. any alcohol consumed prior to 8:45 is being removed, eliminated by the body.
>
> So even if a person continues to drink alcohol, the process of elimination starts as soon as you have any alcohol in your bloodstream. So that we have two hours—approximately two hours of time there where the body is removing some of the alcohol that was consumed, okay?
>
> The other process that needs to be accounted for is absorption; if there is still absorption that is ongoing in the time between 8:45 and 10:56 p.m.

¶18 The prosecutor asked whether Drewieck was able to calculate what the BAC would have been at the earlier time, knowing what the BAC was two hours later. Drewieck responded,

> I can make an estimate, but the estimate I make is only as good as the information that goes into the estimate so it depends on what kind of information we have available....
>
> I would need to know … as much as possible, what the drinking consumption was like; was there a lot of drinking between 8:30 and 8:45; was there any continuing consumption between 8:45 and 10:56; what—the specific individual we're talking about, are they male—in this case, obviously—what their weight is. Food potentially could

7

have an impact, if they had a full stomach at the time of consumption. Those are the big things.

¶19    The prosecutor asked Drewieck to calculate the BAC at 8:45 p.m. for a person who weighed 200 pounds and consumed no additional alcohol between 8:45, the time of the accident, and 10:56, when the blood sample showing a BAC of .171 was taken. Drewieck responded, "I can give you an estimate … I would estimate that the alcohol concentration would be approximately 0.190 to 0.210."

¶20    Asked by the prosecutor to explain her calculations, Drewieck testified:

> All I did for this calculation was evaluate how much alcohol had been removed from the body during that intervening two-hour period, because I was told, assume no, you know, continuing absorption, no continuing consumption.
>
> So basically there's a range of elimination. The vast majority of people would fall within that range. Depending on how frequently a person consumes alcohol, if someone is a teetotaler and consumes alcohol very rarely, then their body eliminates it much more slowly. A chronic consumer, even an alcoholic, can eliminate alcohol pretty quickly because their body has gotten more used to it….
>
> For the purposes of these calculations I use kind of an average in the middle. I certainly can do a range … but in this case, I used an average elimination rate, which is supported by scientific literature, the studies that have been done that I talked about earlier.

¶21    Schumacher's trial counsel asked no further questions.

### 2. *Drewieck's Rebuttal Testimony and Counsel's Cross-Examination After Schumacher Testified*

¶22    The prosecutor called Drewieck as a rebuttal witness and asked her if her calculation of an estimate of Schumacher's BAC at 8:45 p.m. would change

8

based on Schumacher's testimony of his alcohol consumption between the time of the accident and the time his blood sample was taken. Drewieck responded that it would, "Because under those circumstances, then, we need to basically subtract from my previous number the alcohol that was consumed after the [accident] because obviously if it's consumed after the [accident] it doesn't affect what their BAC was at the time of [the accident]." She explained that she could make "an estimate" based on Schumacher's testimony regarding his alcohol intake after the accident by starting with the known BAC at the time of the blood draw and then "accounting for the amount of alcohol that was consumed before the blood was drawn but after the [accident]." Drewieck further explained that the new estimates she could calculate would take into account the effect that the drinks consumed after the accident would have on the test result, because the alcohol consumed after the accident cannot be "count[ed] against the person."

¶23    Drewieck calculated the new estimate and testified that, in doing so, she assumed that the subject of her estimate was a 200-pound man who was driving a vehicle at 8:45 p.m. and had his blood drawn at 10:56 p.m. showing a BAC of 0.171, and who between 8:45 p.m. and 9:30 p.m. drank three to four Pabst Blue Ribbon beers and two shots of whiskey. She further explained that she used "a standard alcohol concentration for a beer of 4% and … a standard 100 proof one ounce for each shot, okay, and the beer is 12-ounce cans." Drewieck testified that, based on these assumptions, she "would estimate … the blood alcohol concentration at the time of [the accident] would be somewhere between 0.08 and 0.11."

¶24    Asked by the prosecutor to calculate an estimate if only the beer and no whiskey had been consumed, Drewieck did so and testified that, "If the two shots were not consumed and all we're subtracting from the blood alcohol

9

concentration is what the three to four beers would contribute, I would estimate that the blood alcohol concentration at the time of [the accident] would be approximately 0.12 to 0.15, with the same assumptions that I stated earlier."

¶25 In response to further questioning by the prosecutor, Drewieck testified that it would take "12 to 13 [standard] drinks for a 200-pound male to reach 0.171" between 6:30 p.m., approximately when Schumacher testified he drank three beers before the accident, and 10:56 p.m., when his blood was drawn.

¶26 Drewieck testified that her BAC calculations were "just an estimate. The solid number that we have is the blood alcohol concentration that was reported on the sample that was tested in our laboratory." The prosecutor asked, "Is it fair to say that your calculations are only as good as the information is that is put into those calculations?" Drewieck responded, "Absolutely." Drewieck concluded her direct examination on rebuttal by testifying,

> [Retrograde extrapolation is] widely used to evaluate drinking situations like this. As I've stated all along, and you [the prosecutor] said yourself, the calculation, the estimate is only as good as the information that goes into it, and it's absolutely nowhere near as reliable and as solid as the test result itself.
>
> But this type of calculation is based on scientific principles of absorption and elimination and how alcohol spreads throughout your body. So it's based on science. Depends on how good the information is that I am given.

¶27 On cross-examination, Schumacher's trial counsel asked Drewieck about the different factors that go into the calculation, and she responded, "There are lots of factors that go into the calculations like these." Counsel asked Drewieck whether it would make a difference if any of the drinks consumed were a twenty-ounce "tall boy" rather than a twelve-ounce can, and she responded, "that would certainly make a difference," as would changing the number of beers

10

consumed from three or four to a higher number like seven. Counsel asked Drewieck how she arrived at the standard alcohol concentration of 4% for one beer, and she responded, "It's just the number that we use in doing these types of calculations. Certainly, beers are higher; some beers are lower. I can use a different number … I just did not know what Pabst Blue Ribbon was offhand." Counsel asked a similar question about the use of 100 proof for the whiskey, and she responded that that was also just a number, arrived at by "consider[ing] a standard drink [as] one ounce of 100 proof or one and a quarter ounces of 80 proof" or, in other words, "a perfectly poured shot."

### B. Trial Counsel's Testimony at the *Machner* Hearing

¶28     At the *Machner* hearing, Schumacher's trial counsel acknowledged that the key element of the OWI-PAC offense at trial was Schumacher's BAC at the time of the accident. He testified that he anticipated the expert using retrograde extrapolation to calculate Schumacher's BAC at the time of the accident; that he was familiar with the retrograde extrapolation process, with the criticisms of its use, and with the variables used in the calculations; that he had reviewed books and articles on retrograde extrapolation; that he had consulted with his colleagues in the public defender's office about the expert's use of the process; and that he had tried unsuccessfully to speak to the expert before trial.

¶29     Counsel testified that, when Drewieck initially testified, counsel did not on cross-examination ask Drewieck about the BAC calculation because,

> I thought the expert had actually done a pretty good job herself of qualifying how she had come to the conclusions in … her testimony. It was … the fact that she had brought up that there were a number of variables, she was making guesses. So I didn't want to beat a dead horse. I thought it would be apparent to the jury.

11

¶30    Counsel further testified,

>    I believe [Drewieck] had actually addressed why the calculation she was making [was] pure conjecture [and] if I went up and doubled down on the things that she already said, that I didn't think that would come across well … there was nothing for me to—anything new for me to elicit, and I really just thought she went over the issues herself.

¶31    Counsel testified that he asked Drewieck on cross-examination about the effect on the calculations of the size and alcohol content of the drinks Schumacher consumed, but that he did not ask her about the effect of any food consumption by Schumacher or Schumacher's rate of alcohol elimination.  He testified that he did not ask Drewieck about these variables because,

>    I think the single factor that I was keyed in on is it was very late; the trial had gone on for a long time.  And, being honest, I don't think it looked like the jury was paying attention at all at that point … I figured I had maybe a few questions that they would pay attention to, so I just tried to focus on the things that I thought someone in the jury would know, like, you know, that's a really low assumption for an alcohol content for a beer or that a shot was poured perfectly or in that amount, things like that.  I figure I had a really limited window to actually make an impression on the jury.

¶32    Counsel testified that he agreed in theory that challenging the expert on cross-examination was important, but that at the trial, he believed that the expert

>    seemed very up front about the … issues themselves regarding retrograde [extrapolation] … I thought she did a good job of raising the issues herself.  And while I likely planned to go more in depth, by the time I got to cross, like I said, I just really felt like I had a really limited window to make an impression on the jury … I was just afraid they wouldn't pay attention at all.

## C. Circuit Court's Ruling

¶33     The circuit court concluded that Schumacher had not met his burden to show deficient performance.  The court found that the record supported trial counsel's belief that Drewieck made "a fair amount of qualifications or indicated limitations as to her estimates as to what Mr. Schumacher's blood alcohol level would be….  And [counsel] didn't feel it was necessary to point out or to do that further in front of the jury in concern of potentially alienating the jury."  The court found that, after Drewieck made additional calculations based on Schumacher's testimony, counsel on cross focused on a few questions about the issues that the jury would have "understood more … rather than, again, potentially alienating the jury."  The court also found that counsel's questions on cross-examination informed the jury that there was no "stipulation to the expert's calculations."

¶34     The circuit court found that counsel "clearly understood the issue of retrograde extrapolation before the trial started.  He addressed it."  The court found that, while other attorneys may have engaged in more or less cross-examination, counsel here "had … strategic reasons as to why he handled the issue the way he handled it."  The court concluded that it did not "see anything that was outside the professional norms for a defense attorney in an OWI case … I do believe that [counsel's] actions were within the professional norms."

¶35     The circuit court also concluded that Schumacher failed to meet his burden to show prejudice.

## III.  Analysis

¶36     Schumacher argues that his trial counsel provided deficient performance by inadequately cross-examining Drewieck regarding the reliability

of retrograde extrapolation and the assumptions she used to calculate Schumacher's BAC at the time of the accident. As shown above, and as the State argues in response, the record refutes Schumacher's argument.

¶37 I first summarize the additional background provided above. Through counsel's cross-examination of Drewieck the first time she testified, counsel elicited testimony that the BAC reported at the time of the blood draw was not Schumacher's BAC at the time of the accident two hours earlier, and that Drewieck could not know, and could only estimate, Schumacher's BAC at the time of the accident. On redirect examination, Drewieck explained that her estimate was only as good as the information that went into the estimate and, thus, depended on the information that was available. She then calculated an estimate based only on a 200-pound male who eliminated alcohol at an average rate and had a BAC of 0.171 two hours after driving. Counsel did not question Drewieck further at that point because he believed Drewieck had herself qualified her calculations and sufficiently indicated to the jury that she was making guesses.

¶38 When Drewieck on rebuttal calculated estimates of Schumacher's BAC at the time of the accident, based on the alcohol Schumacher testified he consumed after the accident, Drewieck again testified that her calculations were just estimates that were only as good as the information going into them and were "nowhere near as reliable and as solid" as the test result. After Drewieck calculated two additional BAC estimates based on Schumacher's testimony about his alcohol consumption, Schumacher's counsel questioned Drewieck on cross-examination regarding her reliance on the variables supporting those two estimates. Counsel limited his cross-examination to questioning the accuracy of the key variables that Drewieck relied on, and that were most likely to be understood by the jury (number, type, and alcohol content of the drinks

14

Schumacher consumed after the accident), in order to keep what he perceived as the jury's waning attention and because he believed, again, that Drewieck had herself identified the limits of her calculations based on those variables.

¶39    I now explain why the record refutes Schumacher's deficient performance argument. When Drewieck testified, both initially and on rebuttal, Schumacher's counsel made, as the circuit court found, a strategic decision not to engage in further questioning regarding the reliability of retrograde extrapolation, because doing so would elicit repetitive answers at the risk of alienating the jury. In addition, a prudent attorney could reasonably decide that further questioning on the same points already conceded by Drewieck would also risk Drewieck refining her answers so as to soften the degree of guesswork and qualification to which she had already admitted. Given that Drewieck had herself effectively acknowledged the limits of retrograde extrapolation, both initially and on rebuttal, trial counsel's strategic decision not to further question Drewieck regarding the reliability of retrograde extrapolation was both reasonable and well within professional norms.

¶40    Schumacher does not identify what testimony regarding the limits of retrograde extrapolation further questioning would have elicited. Schumacher points to the "minimal data" that made Drewieck's first estimate unreliable, but the record shows that Drewieck's testimony offered on direct and redirect and in response to trial counsel's cross-examination so strongly qualified her estimate that the State called her back in rebuttal in an attempt to fill in the gaps she had initially identified. Schumacher acknowledges that Drewieck's subsequent estimates provided on rebuttal were based on additional data derived from Schumacher's testimony, but he asserts that certain critical data such as food consumption and "whether Schumacher was in the absorption or elimination stage" were still missing. However, at trial counsel did challenge the accuracy of

15

the variables that Drewieck used, and he did so in a way that would focus the jury, whose attention he believed was waning, on variables that the jury would readily digest. Schumacher's assertion that his trial counsel "did not adequately cross-examine [Drewieck] regarding the accuracy of the assumptions she was relying on in making her calculations" is belied by the record.

¶41 The circuit court found that counsel made the strategic decision to focus on that which the jury would most readily understand and pay attention to. Counsel's cross-examination focused the jury on the deficiencies most directly associated with Drewieck's new estimates, and his strategic decision to do so was therefore both reasonable and within professional norms.

¶42 Schumacher analogizes this case to *State v. Zimmerman*, 2003 WI App 196, 266 Wis. 2d 1003, 669 N.W.2d 762. In that case, a DNA expert's testimony suggested that DNA results from samples taken from the scene of a homicide were inconclusive, when in fact the test results excluded the defendant as a source of the DNA. *Id.*, ¶40. This court ruled that "[c]ounsel's failure to challenge [the expert's] testimony with this data had the effect of essentially stipulating that the evidence was inconclusive," and was therefore deficient performance. *Id.* Here, however, Schumacher's trial counsel did challenge Drewieck's testimony, regarding both the unreliability of retrograde extrapolation generally and the inaccuracy of certain of the significant variables Drewieck specifically used in this case. Here, the circuit court found that counsel's conduct

did not amount to a stipulation to Drewieck's calculations, and the record reviewed above supports that finding.[4]

¶43    Finally, Schumacher also asserts that trial counsel fell below the standard of an ordinarily prudent lawyer by failing "to present evidence that experts in the field question the reliability of retrograde extrapolation," citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). I do not reach this argument because Schumacher failed to raise it in his postconviction motion in the circuit court. *See Schill v. Wisconsin Rapids Sch. Dist.*, 2010 WI 86, ¶45 & n.21, 327 Wis. 2d 572, 786 N.W.2d 177 (explaining that issues not raised in the circuit court are forfeited, and supporting the proposition that appellate courts generally do not address forfeited issues); *Schwittay v. Sheboygan Falls Mut. Ins. Co.*, 2001 WI App 140, ¶16 n.3, 246 Wis. 2d 385, 630 N.W.2d 772 (stating that "[a] party must raise an issue with sufficient prominence such that the [circuit] court understands that it is called upon to make a ruling"); *Schonscheck v. Paccar, Inc.*, 2003 WI App 79, ¶11, 261 Wis. 2d 769, 661 N.W.2d 476 ("A fundamental appellate precept is that we 'will not … blindside [circuit] courts with reversals based on theories which did not originate in their forum.'" (quoting *State v. Rogers*, 196 Wis. 2d 817, 827, 539 N.W.2d 897 (Ct. App. 1995)).

---

[4] Schumacher also analogizes this case to *State v. Jeannie M.P.*, 2005 WI App 183, 286 Wis. 2d 721, 703 N.W.2d 694. In that case, the circuit court found that trial counsel was deficient in "fail[ing] to make any effort whatsoever to impeach [a witness's] testimony corroborating [evidence against the defendant]." *Id.*, ¶16. Again, however, here Schumacher's trial counsel did make an effort to cast doubt on Drewieck's expert testimony.

17

¶44    In sum, Schumacher's argument that trial counsel was deficient for not adequately cross-examining Drewieck regarding the reliability of retrograde extrapolation and the accuracy of the assumptions Drewieck used in her calculations fails.

## CONCLUSION

¶45    For the reasons stated, Schumacher's ineffective assistance of trial counsel claim fails because he has not met his burden to show that counsel performed deficiently.  Therefore, I affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.